# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| HARRIS N.A., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| BACCHUS FRESH INTERNATIONAL, ) | |
| INC., et al., ) | |
| ) | |
| Defendants. ) | |
| ──────────────────────────── ) | |
| VALPER, S.A. DE C.V., ) | |
| ) | |
| Cross-Claimant and Third-Party ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 11 C 1647 |
| ) | |
| BACCHUS FRESH INTERNATIONAL, ) | Consolidated with 11 C 1654 |
| INC., ) | |
| ) | Judge Rebecca R. Pallmeyer |
| Cross-Defendant, ) | |
| ) | |
| DAVID F. ESTERLINE, an Individual, ) | |
| ) | |
| Third-Party Defendant. ) | |
| ──────────────────────────── ) | |
| AGRICOLA Y COMERCIAL CABILFRUT ) | |
| S.A., a Chilean company; SOCIEDAD ) | |
| AGRICOLA SATURNO S.A., a Peruvian ) | |
| company; C.I. WOLF & WOLF LATIN ) | |
| AMERICA S.A., a Colombian company; ) | |
| FRUTAS PIURANAS SAC, a Peruvian ) | |
| company; ) | |
| ) | |
| Intervening Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| BACCHUS FRESH INTERNATIONAL, ) | |
| INC., and DAVID F. ESTERLINE, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

The Perishable Agricultural Commodities Act of 1930 ("PACA"), 7 U.S.C. §§ 499a-499t (2009 & Supp. 2010) protects sellers of perishable agricultural commodities from unfair conduct by buyers of such commodities, including failure to pay promptly and fully for produce ordered. PACA creates a statutory trust in favor of sellers of produce, under which the buyer holds the produce, and any proceeds and receivables from the produce, in trust for the benefit of the seller. 7 U.S.C. § 499e(c)(2). The claimants in this case sold perishable agricultural commodities to Defendant Bacchus Fresh International, Inc. ("Bacchus"), and Bacchus failed to pay for that produce. The court established a claims procedure and entered a judgment against Bacchus. Plaintiffs AgroExport LLC, Sanchez Hass Avocado Corp., Rio Queen Citrus, Inc., Cohn Produce Company, Inc., and New Mundoexport Fruit, Inc. (collectively "AgroExport Group" or "Agro Plaintiffs") now seek entry of a judgment in the same amount against individual Defendant David F. Esterline ("Esterline" or "Defendant") on the theory that Esterline was an officer of Bacchus and had the power to manage Plaintiffs' trust assets. For the reasons set forth below, the court denies the Agro Plaintiffs' motion for summary judgment [149] and grants Defendant Esterline's motion for summary judgment [146].

**INTRODUCTION**

The AgroExport Group are unpaid sellers of wholesale quantities of perishable agricultural commodities ("produce") who sold produce to the Bacchus and never received payment. On June 17, 2011, this court entered a Consent Injunction and Claims Procedure Order. (*See* June 17, 2011 Consent Inj. and Order [37].) The Plaintiffs' PACA trust claims total in the principal sum of $848,102.74, plus interest and fees, resulting in total claims of $944,551.54, and the AgroExport Group's claims total $318,712.07, including principal, interest and attorneys' fees. (*See* Jan. 18,

2012 Minute Order [104]; July 19, 2012 Minute Order [141].)[1] Plaintiffs contend that Esterline, as a principal of the Company, is personally liable for the PACA debts of the Company. On cross-motions for summary judgment, the court concludes, as explained below, that Esterline is not personally liable.

## FACTUAL BACKGROUND

Defendant Esterline began working for Bacchus Fresh International in 1999. At that time, Bacchus was a division of Fresh America. (Esterline Aff. ¶ 3, Attach. 1 to Def.'s Rule 56.1(a) Statement of Facts [148] (hereinafter "Def.'s 56.1(a)".) In 2001, the divisional president of Bacchus Fresh International, Robert M. Jajkowski ("Jajkowski"), purchased the Bacchus division. (*Id.*) After Jajkowski's purchase, the Bacchus staff consisted of three other individuals: Mary McGuiness, import coordinator; Ana Meza, bookkeeper; and Esterline, produce salesman. (Esterline Aff. ¶ 3; Meza Aff. ¶ 3, Attach. 2 to Def.'s 56.1(a).) The Company was incorporated, and Jajkowski offered Esterline a minority ownership interest. (Esterline Aff. ¶¶ 4-5.) Esterline accepted, agreeing to pay approximately $90,000 for twenty percent of the Company stock. (*Id.* ¶ 5.) Esterline paid this sum through a payroll deduction of $1,000 from every paycheck for about three years. (*Id.*) At all relevant times, Jajkowski retained ownership of the remaining eighty percent of the Company stock. (*Id.*)

Corporate documents name Esterline as the Company's vice president, and the Illinois Secretary of State's website identifies him as the Company's secretary. (Esterline Aff. ¶ 6; Meza Aff. ¶ 9.) The 2009 and 2010 Illinois Domestic/Foreign Annual Reports also identify Esterline as one of the Company's officers or directors, and its secretary. (Pls.' Rule 56.1(a) Statement of Facts [149-2] (hereinafter "Pls.' 56.1(a)"), ¶ 15.) The same information is also reflected by Blue Book

---

[1] The members of the AgroExport Group's trust claims are valid and properly perfected pursuant to 7 U.S.C. §§ 499a-499t of the PACA in the following amounts: AgroExport, LLC $208,518.32; Sanchez Hass Avocado Corp. $20,697.86; Rio Queen Citrus, Inc. $20,413.60; Cohn Produce Company, Inc. $5,536.39; New Mundoexport Fruit, Inc. $63,545.90.

Services, Inc. (a produce industry credit reporting agency). (*Id.* ¶ 16.) Esterline is also listed on three credit applications. (*Id.*) Esterline asserts that these applications were filled out and signed by Jajkowski alone, and that he was not aware of their existence prior to this litigation. (Esterline Suppl. Aff. ¶¶ 18-19, Attach. 1 to Def.'s Resp. to Pls.' 56.1(a) [156] (hereinafter "Def.'s 56.1 Resp.").) Esterline's name also appears on Bacchus's PACA license. (*See* PACA Documents, Ex. B to Pls.' Resp. to Def.'s 56.1(a) [159] (hereinafter "Pls.' 56.1 Resp.").)

It is undisputed that Esterline played some role as an officer of the corporation. Esterline occasionally signed documents as an officer of Bacchus. (Esterline Aff. ¶ 21.) For example, once a year, the Company's attorney sent Esterline a statement to sign, as the Company's secretary, confirming that there had been no change in the corporation's status. (*Id.*) Esterline also signed a Harris Bank new account application, a $1,750,000.00 Promissory Note, and a General Security Agreement on behalf of Bacchus in favor of Harris Bank. (Harris Documents at 2, Ex. A to Pls.' 56.1 Resp.) Esterline maintains, however, that he only signed documents at Jajkowski's direction, and that he never carefully reviewed any of these documents, or retained any copies for his own records. (Esterline Aff. ¶ 21.) Esterline also did not have custody or control of Bacchus's corporate minute books, and does not even know whether such records exist. (Esterline Aff. ¶ 23; Meza Aff. ¶ 24.)

Esterline also asserts that he never attended stockholders' meetings, board of directors' meetings, or any other corporate meetings. (Esterline Aff. ¶¶ 11-13.) Documents that Esterline and Jajkowski signed to open a Harris Bank account for Bacchus on April 28, 2010 state that a board of directors meeting was held that day at which a quorum was present (Harris Documents at 2), but Esterline denies that he attended any such meeting. (Def.'s Resp. to Pls.' 56.1 Statement of Additional Facts, [162] ¶ 2.) Aside from the Harris Bank documents, there is no evidence of formal corporate meetings. Esterline acknowledges that he attended meetings with the Company's attorney(s), but asserts that he did so only when Jajkowski wanted him to sign a document.

(Esterline Aff. ¶ 15.) Esterline also attended one meeting with the Company's accountant in 2006 or 2007. (*Id.*)

Esterline received a bi-monthly paycheck from Bacchus, and, on one occasion at the end of 2006, was paid a bonus–at the direction of, and in an amount determined by, Jajkowksi. (Esterline Aff. ¶ 24; Meza Aff. ¶ 25.) Esterline maintains that as a produce salesman, he had no decision-making power for any purpose except for selling produce. (Esterline Aff. ¶ 8; Meza Aff. ¶¶ 5, 6, 10, 11.) At some point, the Company added employees, but Esterline did not supervise or manage any of them. He had no authority to hire or fire other workers, and had no input into how much they were paid. (Esterline Aff. ¶ 25; Meza Aff. ¶ 18.) On one occasion, when two other employees wanted to become partners in the business, Esterline supported the idea, but Jajkowski rejected it and instead fired the two employees. (Esterline Aff. ¶ 14; Meza Aff. ¶ 17.)

Even after becoming a shareholder, Esterline asserts, he continued on in his previous role as a produce salesman, while Jajkowski maintained all responsibility and control over the management and day-to-day operations of the Company. (Esterline Aff. ¶¶ 8-9; Meza Aff. ¶¶ 5, 6, 10, 11.) Esterline was only responsible for his own sales, and did not approve suppliers used by other Company employees or those from whom other Company employees made purchases. (Meza Aff. ¶ 13.) Esterline acknowledges that he represented the company in actions before the United States Department of Agriculture, collecting sums owed to Bacchus and defending claims against the trust. (Pls.' 56.1(a) ¶ 14; Esterline Suppl. Aff. ¶¶ 13-17.) He explains, however, that he represented Bacchus on those particular matters because they involved his customers and accounts. (Esterline Suppl. Aff. ¶¶ 13-17.)

Esterline reports that he had only a limited role in managing the Corporation's financial affairs. On some occasions, Esterline extended lines of credit of up to $50,000 to customers (Pls.' 56.1(a) ¶ 13), but he did so only with Jajkowski's approval, and did not have authority to make decisions concerning the credit limits of other Company salespersons' accounts. (Esterline Suppl.

Aff. ¶¶ 11-12; Meza Aff. ¶ 14.) As a salesman, Esterline was accountable for collecting money from Bacchus's customers, and therefore had access to accounts receivable information, and was able to access customer invoices in the Company computer. (Esterline Aff. ¶¶ 27, 31, 37; Meza Aff. ¶ 27.) He could access only such basic information as the customer's name, the quantity, and the sale price, however, and had no power to alter the invoices. Only Meza and Jajkowski were authorized to do so. (*Id.*)

Significantly, Esterline had no access to accounts payable information. (Esterline Aff. ¶ 32; Meza Aff. ¶ 31.) During most of his tenure with Bacchus, all accounts payable were handled by Meza and Jajkowski. (Esterline Aff. ¶ 28; Meza Aff. ¶ 28.) Near the end of Esterline's employment, Hernan Brave ("Brave") was also involved with accounts payable. (*Id.*) Brave acted as director of procurement for Bacchus, purchasing produce from the Company's office in New Jersey and handling grower relations. (*Id.*) Esterline made no decisions about which bills or vendors were paid. (Esterline Aff. ¶ 29; Meza Aff. ¶¶ 13, 29.) And, though he was a signatory on the Company's bank account, Esterline claims he never reviewed the account, never received or reviewed bank statements, and simply signed documents at Jajkowksi's direction. (Esterline Aff. ¶¶ 18, 22; Meza Aff. ¶ 20.) Esterline had no online access to Bacchus's funds or banking records; had no way of reviewing any of the financial information; had no access to Bacchus's books and records; never had possession or control of the Bacchus checkbook (if there was one–Esterline does not know); never knew the balance in Bacchus's bank account; and was not authorized to make wire transfers. (Esterline Aff. ¶¶ 17, 20; Meza Aff. ¶¶ 21-23.) In her affidavit, Meza explained that she prepared checks and printed them on a computer and does not recall Esterline ever signing any checks. (Meza Aff. ¶ 8.) Meza confirmed Esterline's account that he had no access to information about Bacchus's expenses or where the money went; those things were the sole purview of Jajkowski. (Esterline Aff. ¶ 26; Meza Aff. ¶ 26.) Though Esterline occasionally received an "Income Statement" for Bacchus, the statements were prepared by Jajkowski, and Esterline did not know whether the

6

statements accurately reflected the Company's financial condition. (Esterline Aff. ¶ 33.)

Plaintiffs have offered little evidence of Esterline's involvement with management of Bacchus's financial affairs. Esterline did sign at least one check on August 5, 2010. (Pls.' 56.1(a) ¶ 10.) Esterline explained that he signed this check, a payment to a grower, when Jajkowski telephoned Meza from Spain and directed her to cut the check and ask Esterline to execute it. (Esterline Suppl. Aff. ¶¶ 4-5.) Esterline also opened envelopes containing incoming checks fewer than five times, but only when neither Jajkowski nor Meza was in the office. (Esterline Aff. ¶ 16.) He never opened bills, invoices or other mail that did not appear to be a depositable check. (Esterline Aff. ¶ 19.) Meza, as bookkeeper, kept track of each day's receipts; she did not share this information with Esterline. (Meza Aff. ¶ 12.)

Esterline last received an Income Statement in 2009, which reflected that the Company showed a profit of $55,618.75. (Esterline Aff. ¶ 33.) On January 26, 2011, he resigned as an employee, officer, and stockholder of Bacchus. (*Id.* ¶ 36.) Just before Esterline left the Company, he received calls from vendors reporting that they had not been paid in more than eighty days, which, according to Esterline, was unusual for Bacchus. (*Id.* ¶ 30.) Esterline referred all questions to Jajkowski. (*Id.*) At that time, Esterline claims he believed that Bacchus had sufficient funds to pay all its creditors, based upon the information that he received from Jajkowski. (Esterline Aff. ¶¶ 33, 36.)

## DISCUSSION

### I.   Standard of Review

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On cross-motions for summary judgment, the court construes all facts and inferences "in favor of the party against whom the motion under consideration is made." *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th

Cir. 2005)); see also *Gross v. PPG Industries, Inc.*, 636 F.3d 884, 888 (7th Cir. 2011); *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation and citation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

## II. Merits

PACA requires produce dealers to make "full payment promptly" for any produce they purchase. 7 U.S.C. § 499(b)(4). Buyers of produce must hold proceeds from the sale of that produce in a non-segregated floating trust until the seller is paid in full. 7 U.S.C. § 499e(c)(2). Several circuits have held that PACA's statutory trust provision permits plaintiffs to recover against both a corporation and its controlling officers for breach of fiduciary duty. *See, e.g., Weis-Buy Svcs., Inc. v. Paglia*, 411 F.3d 415, 421-22 (3d Cir. 2005); *Golman-Hayden Co., Inc. v. Fresh Source Produce*, 217 F.3d 348, 351 (5th Cir. 2000). The Seventh Circuit has also recognized such a remedy. *See Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 669 (7th Cir.

2002) (citing *Golman-Hayden*, 217 F.3d at 351).

"Individual liability . . . is not derived from the statutory language, but from common law breach of trust principles." *Bear Mountain Orchards, Inc. v. Mich-Kim, Inc.*, 623 F.3d 163, 169 (3d Cir. 2010). A controlling officer of a corporation may be held personally liable when: (1) the individual's involvement with the company was sufficient to establish a legal responsibility; and (2) the individual breached a fiduciary duty to the PACA creditors. *Shepard v. K.B. Fruit & Vegetable, Inc.*, 868 F. Supp. 703, 705-06 (E.D. Pa. 1994). Courts have considered various factors to determine whether an individual was sufficiently involved with the company, such as whether an individual was a director (*Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 706 (2nd Cir. 2007)), was active in the management of the company (*Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir. 1997)), had control of day-to-day operations (*Okun, Inc. v. Zimmerman*, 814 F.Supp. 346, 349-50 (S.D.N.Y. 1993)), signed for company accounts (*K.B. Fruit & Vegetable*, 868 F. Supp. 703, 706 (E.D Pa. 1994)), had a role in causing the breach of trust (*Shepard v. K.B. Fruit & Vegetable*, 868 F. Supp. at 706), or was the primary actor in failing to pay under PACA (*Bronia Inc. et al. v. Ho*, 873 F. Supp. 854, 861 (S.D.N.Y. 1995)).

In small corporations, like Bacchus, courts have recognized that an individual may hold a corporate office or shares for entirely legitimate purposes, and not exercise any day-to-day control over the company. *Mid-Valley Produce Corp. v. 4-XXX Produce Corp.*, 819 F. Supp. 209 (E.D.N.Y. 1993). The Third Circuit considered the issue of whether an officer and shareholder had actual control over the management of a PACA trust in *Bear Mountain Orchards, Inc. v. Mich-Kim, Inc.*, 623 F.3d 163, 169 (3d Cir. 2010). In *Bear*, the Third Circuit explained that the liability of an individual under PACA does not depend on whether she nominally held an officer or director position, nor the size of her shareholding. *Id.* Instead, liability turns on whether the individual had the authority to direct the control (*i.e.*, manage) PACA assets held in trust. *Id.* If so, that person is secondarily liable for breaching the duty to preserve the PACA trust. *Id.*

9

The defendant in *Bear* was a corporate officer during the relevant time period and owned fifty percent of the stock in a small "mom and pop" corporation subject to PACA. Despite her title and ownership status, the Third Circuit concluded she had no actual authority over how her husband operated the company and therefore did not have power to manage the plaintiffs' PACA assets. 623 F.3d at 171-172. In support, the court reiterated the principle that many circuits have adopted for assessing claims of secondary liability under PACA: "[I]ndividual shareholders, officers, or directors of a corporation *who are in a position to control trust assets*, and who breach their fiduciary duty to preserve those assets, may be held personally liable under PACA." 623 F.3d at 171 (emphasis in original); *Golman*, 217 F.3d at 351; see also *Coosemans*, 485 F.3d at 705-06; *Sunkist*, 104 F.3d at 283. Concluding that the defendant wife was not in that group, the *Bear* court noted that all management decisions were made by her husband and his office manager. *Id.*

When considering a small corporation where titles and formalities may be less meaningful, courts rely primarily on context to (i) determine whether an individual holds a position that suggests a possible fiduciary duty to preserve the PACA trust assets (*e.g.*, officer, director, and/or controlling shareholder) and (ii) assess whether that individual's involvement with the corporation establishes the *actual* ability to control the PACA trust assets at issue. *Id.* at 172. An individual's formal position within the company does not necessarily place him "in a position to control trust assets" for PACA liability. *Id.* at 171-72. "The ability to control is core." *Id.* at 172.

Plaintiffs assert that Esterline was "in a position to control" the trust assets of the Company. (Pls.' Mem. in Supp. of Mot. for Summ. J. [149-1] (hereinafter "Pls.' Mem."), at 3, 8.) Much of the evidence they rely on, however, relates to Esterline's position or title within the Company, rather than his actual authority. Thus, they emphasize that Esterline was an officer during the relevant period, and urge that this means he was necessarily in a position to control trust assets. (*Id.*) Plaintiffs point out, further, that Esterline was a signatory for the corporate bank account, signed corporate documents, and held himself out as vice president and secretary. (*Id.*) As Plaintiffs see

10

things, corporate documents identifying Esterline establish that Esterline was "in a position to control" the Company's PACA trust assets. (*Id.*) They suggest that Esterline had and exercised the power to bind the Company contractually and make all business decisions. (*Id.* at 3.) The fact that he did not actually exercise that power does not excuse him from PACA liability, Plaintiffs argue, because all individuals in positions like Esterline's are required to act in the best interests of those producers who entrusted their produce to Bacchus. (*Id.* at 4.)

It is undisputed that Esterline was an officer of the company. Esterline acknowledges that he held the titles of vice president and secretary and that he held a shareholder interest in Bacchus. As explained above, however, liability does not turn on Esterline's titles or shareholder status; what matters is whether he had the authority to control the PACA assets held in trust. *See Bear*, 623 F.3d at 171-72. Esterline's formal position does not answer that question.

Plaintiffs contend that there is indeed evidence that Esterline "actively controlled" the PACA trust assets, as well. (Pls.' Mem. at 3.) This control was manifested, Plaintiffs urge, by Esterline's signing a check; extending lines of credit to customers; requesting lines of credit for the Company; receiving e-mail messages regarding collecting funds and settling account balances; representing the Company in administrative law proceedings before the USDA; and actively holding himself out as the Company's vice president, principal, owner, partner, and/or officer. (*Id.*) Esterline maintains that though he took these actions, he was only nominally an officer of the Company, had no actual control over PACA trust assets, and did not breach any fiduciary duty to the trust beneficiaries. (Def.'s Mem. in Supp. of Mot. for Summ. J. [147] (hereinafter "Def.'s Mem."), at 3.) Even after becoming twenty-percent owner and nominally taking on the role of vice president and secretary, Esterline points out, he continued on in his role as a produce salesman while Jajkowski maintained all managerial and operational control over the Company. (Esterline Aff. ¶¶ 8-9; Meza Aff. ¶¶ 5, 6, 10, 11.)

As an officer, shareholder, and signatory on the Company's bank account, Esterline did

11

have the apparent authority to control trust assets. The remaining evidence, however, supports the conclusion that Esterline did not actively manage the Company, had little control over the Company's operations, and thus, could not actually control trust assets. It was Jajkowski, not Esterline, who maintained control of Bacchus's business. There is inconclusive evidence that Esterline may have attended a single corporate meeting: documents Esterline and Jajkowski signed to open the Harris Bank account for Bacchus on April 28, 2010 state that a board of directors meeting was held that same day (Harris Documents at 2), but Esterline denies attending any such meeting and claims he did not attend corporate meetings, including stockholders' meetings or board meetings, at all. (Esterline Aff. ¶¶ 11-13; Def.'s Resp. to Pls.' 56.1 Statement of Additional Facts ¶ 2.) Further, Esterline maintains that he only signed corporate documents at Jajkowski's direction, he retained no such documents for his own records, and he was unaware of whether Bacchus even maintained corporate minute books. (Esterline Aff. ¶¶ 15, 21, 23; Meza Aff. ¶ 24.)

There is little evidence that Esterline was able to make any management decisions on behalf of the Company. Esterline had no authority to hire or fire employees and had no input regarding what employees were paid. (Esterline Aff. ¶ 25; Meza Aff. ¶ 18.) Plaintiffs point out that Esterline extended lines of credit to customers (Pls.' Mem. at 3), but Esterline only did so with Jajkowski's approval, and had no authority to make decisions on the credit limits of other salespersons' accounts. (Esterline Suppl. Aff. ¶¶ 11-12; Meza Aff. ¶ 14.) Plaintiffs also claim that Esterline requested lines of credit for the Company because he is listed as an officer of the Company on applications for credit. (Pls.' Mem. at 3; Pls.'s 56.1(a) ¶ 17.) The credit applications, however, were filled out and signed by Jajkowski alone, and Esterline claims that he was not aware of their existence prior to this litigation. (Esterline Suppl. Aff. ¶¶ 18-19.) The e-mails regarding collecting funds and settling account balances that Plaintiffs claim Esterline received were sent after he resigned from Bacchus, and all were all addressed to Jajkowski with Esterline listed as an additional recipient. (*See* Pls.'s 56.1(a) ¶¶ 11-12; Esterline Suppl. Aff. ¶¶ 18-19.)

Esterline was involved in the day-to-day operation of the company, but that involvement was incident to his primary role selling produce. There is no evidence that he controlled the Company's operations. He did not supervise or manage any of Bacchus's employees. Esterline was only responsible for his own sales, and did not approve suppliers used by other Company employees or those from whom other Company employees made purchases. (Meza Aff. ¶ 13.) Esterline had access to accounts receivable because he was accountable for collecting money from his customers if they were not paying in a timely fashion. (Esterline Aff. ¶¶ 31, 37.) But even in that role, Esterline only had access to such basic information as customer name, product quantities, and sale price. (Esterline Aff. ¶ 27; Meza Aff. ¶ 27.) Significantly, Esterline could not make changes to invoices; only Meza and Jajkowski had that authority. (*Id.*)

Nor does Esterline's role as a signatory on Bacchus's bank account change the analysis. The parties dispute the significance of that role; Plaintiffs infer that Esterline had knowledge of, or control over, certain aspects of Bacchus's business based on his title and the fact that he was one of two signatories on the bank account. (*See* Pls.'s 56.1 Resp. ¶¶ 13, 19, 21, 22, 25, 38.) Again, however, Esterline's formal position within the Company does not necessarily place him "in a position to control trust assets" for PACA liability. *See Bear*, 623 F.3d at 171-72. Importantly, Esterline had no actual control over the bank account; though he was a signatory, he was not authorized to issue checks unilaterally and never had control of the check book. There is evidence that Esterline signed one check, but that episode demonstrates the limits of Esterline's authority: he signed it only because Jajkowski–who was out of the country–directed the bookkeeper to issue the check to pay a supplier, and ask Esterline sign it. (Esterline Suppl. Aff. ¶¶ 4-5.) Apart from that single incident, there is no evidence Esterline issued any checks to pay vendors, expenses, or for any other purpose, or that he had any authority to do so.

Significantly, Esterline did not make any decisions about which bills or vendors would be paid. (Esterline Aff. ¶ 29; Meza Aff. ¶¶ 13, 29.) All payables were handled by Jajkowski and Meza.

(Esterline Aff. ¶¶ 28, 32; Meza Aff. ¶¶ 28, 31.) Although, as a salesman, Esterline had access to accounts receivable (Esterline Aff. ¶¶ 31, 37), he never had access to Bacchus's accounts payable. (Esterline Aff. ¶ 26; Meza Aff. ¶ 26.) Esterline played no role in determining how Bacchus would balance its receivables against its payables. Who was paid, when they received payment, and how much they were paid was solely Jajkowksi's decision. (*Id.*) And, as described above, Esterline had only limited access to the Company's financial information. (Esterline Aff. ¶ 18; Meza Aff. ¶¶ 20-22.) He had no access to books and records no information about the Company's bank balance, and no access to the information underlying the "Income Statements" that Jajkowski occasionally provided. (Esterline Aff. ¶¶ 17, 33; Meza Aff. ¶¶ 21, 22.)

In short, the available evidence does not establish that Esterline possessed the power to manage the Plaintiffs' trust assets. Esterline's apparent authority, as a corporate officer, to sign corporate documents, is not sufficient. *See Bear*, 623 F.3d at 174. It was Jajkowski who made all management decisions on behalf of the corporation and controlled all aspects of its finances. *Id.* at 173. Despite his titles, Esterline remained Jajkowski's subordinate, took all direction from Jajkowski, and was never involved in any management decisions. Esterline's involvement as a salesman in the day to day business operations were at Jajkowski's direction and subject to his authority. Esterline "had no ability to manage the corporation, and hence no power to control its use of PACA trust assets." *Id.* at 174.

Moreover, there is no evidence that Esterline was the primary actor in failing to pay under PACA, or otherwise played any role in the breach of trust. Esterline did not control proceeds of sales, deposit funds, or have access to accounts payable. He did not write checks on his own, pay invoices, make purchases, or otherwise dissipate trust assets. Plaintiffs' evidence fails to demonstrate that Esterline possessed the requisite control over trust assets that would support a finding of liability. *See Weis-Buy*, No. 11 CV 2011, 2012 WL 280617, at *14 (concluding that the executive vice president–who purchased produce to fill existing orders, had signature authority on

14

the operating account, received a salary, and drove a company car–was not personally liable because he was not in a position to oversee the preservation of trust assets); *cf. Anthony Marano Co. v. MS-Grand Bridgeview, Inc.*, No. 08 C 4244, 2010 WL 5419057, at *11 (N.D. Ill. Dec. 23, 2010) (one-third shareholder, who had served as vice president and night manager, was personally liable where he oversaw not only the produce but also other trust assets, was a signatory on the bank account, and attended shareholder meetings).

## **CONCLUSION**

For the reasons stated above, the court denies the Agro Plaintiffs' motion for summary judgment [149] and grants Defendant Esterline's motion for summary judgment [146] as to all Plaintiffs.

ENTER:

Dated: March 25, 2013

_____
REBECCA R. PALLMEYER
United States District Judge